IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZIG ZAG HOLDINGS LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>GLEN K. HUBBARD, *et al.*,<br><br>    Defendants.<br>_____/<br><br>GLEN K. HUBBARD, *et al.*,<br><br>    Cross-Claimants,<br><br>  v.<br><br>ZIG ZAG HOLDINGS LLC,<br><br>    Defendant.<br>_____/ | No. C 13-2643 SI<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff's motion for summary judgment and plaintiff's motion to compel discovery were scheduled for a hearing on April 25, 2013. Pursuant to Civil Local Rule 7-1(b), the Court took the motions under submission and ordered further briefing. The Court has reviewed the parties' supplemental papers, and for the reasons set forth below, plaintiff's motion for summary judgment is GRANTED IN PART.

**BACKGROUND**

This lawsuit arises out a dispute over the use of the "Zig Zag Bail Bonds" service mark in the bail bonds industry in Northern California. On June 10, 2013, plaintiff Zig Zag Holdings, LLC filed this lawsuit alleging claims for trademark infringement, unfair competition, unfair business practices, false advertising and trademark dilution. Plaintiff Zig Zag Holdings, LLC is a Nevada limited liability company and James Smith is the sole member and owner of Zig Zag Holdings, LLC. Compl. ¶ 1; Smith Decl. ¶ 2 (Docket No. 38-2). Defendants are Glen Hubbard, Glen Hubbard, Inc. d/b/a Zig Zag Bail Bonds, and Lynn Simon d/b/a Zig Zag Bail Bonds. Lynn Simon is Glen Hubbard's sister.

The parties agree that non-party Margie Cohen started a bail bonding business in or around 1965, and that she used and established the Zig Zag Bail Bonds mark. Richard Wader, who is Glen Hubbard's father-in-law, purchased the bail bonding business from Cohen in 1977. The "Zig Zag Bail Bonds" mark was transferred to Wader with the sale of the business. Wader operated the Zig Zag Bail Bonds business in San Rafael, California for eleven years.

In 1988, Wader sold the Zig Zag Bail Bonds business to his daughter, Reagan Anne Hubbard, and her husband, defendant Glen Hubbard. G. Hubbard Decl. ¶ 2, The parties dispute whether Wader also sold the "Zig Zag Bail Bonds" mark to the Hubbards, or whether Wader only licensed the use of the mark to the Hubbards.[1] The sale of the Zig Zag Bail Bonds business – and the sale or license of the mark – was by oral agreement and was not documented in writing. *Id*. ¶ 3.

In June of 1990, Glen and Reagan Hubbard formed a corporation called Glen Hubbard, Inc. to operate the Zig Zag Bail Bonds business. G. Hubbard Decl. ¶ 7; R. Hubbard Decl. ¶ 7. Glen and Reagan each held 50% of the issued capital stock and were each issued separate stock certificates. *Id*.

In July of 1992, defendants Lynn Simon and Glen Hubbard signed an agreement for "Transfer of Ownership of Zig Zag and Reagan's Bail Bonds." Simon Decl. ¶ 2, Ex. A (Docket No. 41-5). That agreement states,

> I, Glen Hubbard, as owner of the names Zig Zag Bail Bonds and Reagan's Bail Bonds, located in the County of Santa Clara for consideration of 20% per month of the Premium amount of the Undertaking of Bail do hereby transfer and relinquish control and ownership of the name Zig Zag Bail Bond and Reagan's Bail Bonds in the County of Santa Clara to Lynn Sawdey [Simon].

---

[1] This factual dispute is discussed at greater length *infra*.

2

*Id.*

On June 15, 1996, the Hubbards and Simon executed an "Agreement for the Use of the Trade Name 'Zig Zag Bail Bonds.'" *Id*. Ex. A.[2] That agreement identifies the Hubbards as the licensors and Simon as the licensee, and states that "[t]he subject of this agreement is the use of the trade name 'Zig Zag Bail Bonds' the rights to the use of which are presently, solely held by Licensor. It is mutually acknowledged that Licensee currently utilizes this trade name in the San Jose, California office under a separate agreement with Licensor. This agreement is intended to modify that prior agreement to conform to the terms stated herein." *Id*. The agreement states that in exchange for the right to use the "Zig Zag Bail Bonds" mark in the "Gilroy, California area," the "Hayward, California area," and the "Santa Clara County area of California," Simon agreed to pay the Hubbards 18% of the monthly gross undertakings of bail bonds written. *Id*.

In November 2003, the Hubbards and Simon executed another agreement for the use of the "Zig Zag Bail Bonds" mark. The agreement is similar to the 1996 agreement in that it identifies the Hubbards as the Licensors and Simon as the Licensee, and grants Simon a license to use the mark in Gilroy, Hayward and the County of Santa Clara. *Id*. In consideration for the license, Simon agreed to pay the Hubbards $3,500 per month for 86 months and to release her full interest in a property located at 5665 Uplands Dr., Tahoe, California. *Id*.[3]

In August 2005, the Hubbards and Simon executed an addendum to the November 1, 2003 agreement. Simon Decl. Ex. A. That addendum states,

---

[2] Although there is a signature line for Reagan Hubbard, the copy of the July 15, 1996 agreement submitted to the Court does not contain her signature.

[3] The Hubbards state that in 1995, they purchased a property on Uplands Drive in the Tahoe area, together with Reagan's parents, the Waders. Simon later bought into the property as a one-third owner by making a pro rata down payment and pro rata shares of the ongoing mortgage payments. Simon states that she estimates her share of the equity in the property at the time she released her interest in the property in 2003 to be $225,000.00. Simon Decl. ¶ 5. According to the Hubbards, at some point the Waders wished to divest themselves of the Uplands Drive property and there was an agreement that the Waders would receive one third of the equity in the property. R. Hubbard Decl. ¶ 12. The Hubbards state that the property was eventually the subject of a foreclosure which "wiped out" any equity in the property. *Id*. Reagan Hubbard states that her parents blame her and her husband for the financial losses they experienced as a result of the foreclosure. *Id*. ¶¶ 14-15.

3

After further discussions with the attorneys, we have come up with a solution to your concerns.[4]

1. In the event that Glen Hubbard, Inc., and/or Reagan and Glen Hubbard "licensors" choose to sell the Trade name of Zig Zag Bail Bonds, Lynn Simon "Licensee" has the right to maintain the Licensee's locations.

2. In the event that Glen Hubbard, Inc., and/or Reagan and Glen Hubbard upon their Demise, Lynn Simon will have the right to take over the operation of Zig Zag Bail Bonds in any location that exist[s].

3. In the event that Glen Hubbard, Inc., and/or Reagan and Glen Hubbard are removed from the Bail Business for whatever the circumstances may be, Lynn Simon may Geographically extend the licensed usage of Zig Zag Bail Bonds to any location in the state of California.

4. In the event that Glen Hubbard, Inc. ownership is transferred, Lynn Simon has the right to use Zig Zag Bail Bonds in the State of California.

*Id.*

In 2006, Glen Hubbard filed a federal Trademark/Service Mark application for the "Zig Zag Bail Bonds" mark. Docket No. 38-6. The application states that Glen K. Hubbard is the owner of the mark, and the application included a declaration signed by Hubbard stating, *inter alia*, that he had the authority to file the application, that he believed that he was the owner of the service mark, and that all statements in the application were believed to be true. *Id.* On September 25, 2007, the U.S. Patent and Trademark Office registered the "Zig Zag Bail Bonds" service mark to Hubbard. Docket No. 38-4.

In 2010, Glen Hubbard and Lynn Simon had a dispute over several bonds that were written by their respective businesses. Simon Decl. ¶ 8; G. Hubbard Decl. ¶ 15. Hubbard's attorney wrote Simon a letter dated February 3, 2010 stating, *inter alia*, that "Since you have clearly violated the terms of your contract I have been instructed by Glen Hubbard acting for *Zig Zag Bail Bonds* to demand that you immediately cease and desist from any further use of the name, images, website, or forms that are [sic] refer in any way to *Zig Zag Bail Bonds* and that you cease and desist from any representation to any person, insurer, company, advertiser or court official that you are operating under the authority of or as an agent of *Zig Zag Bail Bonds*, Glen Hubbard, or any office that is affiliated with these entities." *Id.*

---

[4] The agreement is signed by Lynn Simon as Licensee, the Hubbards as the Licensors, and by Glen Hubbard as the President of Glen Hubbard Inc. It is unclear from the face of the document whose "concerns" were being addressed, and it is also unclear who is referred to as "we" in that sentence.

4

Ex. B. Simon states in her declaration that after an exchange of letters between attorneys[5] and a conversation between Simon and Hubbard, "the matter was resolved without any litigation to our mutual satisfaction." *Id.* ¶ 9. She also states, "All monies then still due under the Licenses were subsequently paid in full pursuant to the terms of the Licenses and any putative termination of the Licenses was fully rescinded by my brother, Glen Hubbard, and I continue to operate my bail bond business under the provisions of the Licenses." *Id.* ¶ 10. In his declaration, Glen Hubbard similarly states that he and Simon resolved their dispute, that "[a]ll monies then still due under the licenses were subsequently paid in full pursuant to the terms of the Licenses," and that he "expressly rescinded any putative termination of my sister's Licenses . . . ." G. Hubbard Decl. ¶ 16. Hubbard also states that "[a]ny such putative termination [by Hubbard's lawyer] was beyond the scope of my instructions to Mr. Brinkman and most certainly was not my intent." *Id*

On September 8, 2011, Glen and Reagan Hubbard filed a voluntary joint Chapter 7 petition for bankruptcy in the United States Bankruptcy Court in the District of Nevada. Docket No. 38-8.[6] The petition states that the debts are primarily business debts. *Id.* The petition also lists the "Zig Zag Bail Bonds" service mark as community property with no value. *Id.* at Schedule B #22. The mark is not listed as a license. *Id.* at Schedule B #23.

---

[5] Simon's lawyer responded in a letter dated March 9, 2010, stating that Simon had no intention of ceasing to use the Zig Zag Bail Bonds mark, that she had abided by the terms of the contract, and that, *inter alia*, "It is suggested that you and your client reconsider your threat of 'further legal action,' inasmuch as the discovery process alone may bring to the light of day a pattern of practice, involving Joan Perez and John Perez, which your client may prefer to leave alone." Simon Decl. Ex. C. The record before the Court does not contain information regarding the "pattern and practice" involving Joan and John Perez. If this matter goes to trial, this may be an area of inquiry.

[6] The bankruptcy petition lists a Nevada address as the residence of the Hubbards. Plaintiff has filed a copy of a disciplinary complaint filed against the Hubbards and Glen Hubbard, Inc. by the California Department of Insurance regarding the Hubbards' failure to notify the Department of the fact that they moved to Nevada sometime after March and before May of 2009, as well as the Hubbards' failure to notify the Department that they filed for bankruptcy. *See* Docket No. 38-27. According to publicly available documents on the California Department of Insurance website, on November 26, 2013, Glen and Reagan Hubbard and the Department entered into a Stipulation and Waiver pursuant to which the Department revoked the Hubbards' unrestricted bail agent licenses and issued them restricted bail agent licenses requiring that the Hubbards, *inter alia*, maintain residency in California as long as they are bail agents. The Stipulation and Waiver states that the Insurance Commissioner determined good cause existed for the removal of Glen Hubbard, Inc. as a respondent from the complaint. *See In the Matter of the License and Licensing Rights of Glen Keith Hubbard and Reagan Anne Hubbard*, File No. 12CO00957, Stipulation and Waiver, available at http://www20.insurance.ca.gov/cyberdocs/ Libraries/DOCS_WEB/Users/guest/tcsearchresultsdsp.asp.

5

On December 15, 2011, the bankruptcy trustee filed a motion to sell certain assets of the estate, such as telephone numbers owned by Glen Hubbard, Inc., the "Zig Zag Bail Bonds" service mark, assumption and assignment of a commercial lease, and a phone system. Docket No. 47-2. On January 23, 2012, the Hubbards, through their attorney, filed an objection to the motion to sell. Docket No. 48, Ex. 3. With regard to the sale of the service mark, the Hubbards claimed that when they purchased the Zig Zag Bail Bonds business from Wader, the Hubbards were granted a license to use the service mark and that they were not given any ownership interest in the mark. *Id*. The Hubbards also claimed that Wader did not know that Glen Hubbard had applied for and received a federal registration for the "Zig Zag Bail Bonds" service mark, and that if Wader had known of the application he would have opposed it. *Id*. The Hubbards each filed declarations attesting to these facts, and they also submitted two declarations from Richard Wader in support of their objection. Docket Nos. 48, Ex. 4 (G. Hubbard Bankruptcy Decl.); 48, Ex. 5 (G. Hubbard Bankruptcy Decl.).[7] The Hubbards also asserted that there were "numerous unauthorized uses of the Zig Zag Bail Bonds" mark by similar businesses that "are most surely creating confusion" to the public, and that it was reasonable to assume that one or more of these businesses had grounds to challenge the registration. Docket No. 48, Ex. 3 at 10:25-11:4. The Hubbards argued that the registered mark "is most likely valueless and is a likely candidate for a motion by the Debtors to have the asset declared valueless and that it should be abandoned by the Trustee as opposed to being sold." *Id*. at 11:14-16.

---

[7] Wader was deposed in connection with this lawsuit, and during his deposition Wader provided testimony that contradicted his bankruptcy declarations in several respects. Wader testified at his deposition that when he sold the bail bonds business to the Hubbards he sold the entire business, including the service mark. Wader depo. at 26:22-27:4, 49:19-21 (Docket No. 38-23). During his deposition, Wader was shown the bankruptcy declarations that were filed in his name, and he testified that he had never seen the declarations before, had not authorized anyone to sign them on his behalf, and that he disagreed with the substance of those declarations. Wader depo. at 63:22-72:7 (Docket No. 48-24). Specifically, Wader testified that he disagreed with bankruptcy declarations' statements that Wader did not transfer ownership of the service mark to the Hubbards when Wader sold the business to the Hubbards, and that Wader had licensed the service mark to the Hubbards. *Id*.

On summary judgment, plaintiff relies on Wader's deposition testimony, while defendants rely on Wader's bankruptcy declarations. While this discrepancy between Wader's deposition testimony and bankruptcy declarations is certainly curious, as discussed *infra*, the Court's summary judgment order does not rely on Wader's deposition testimony, and instead the Court finds that the question of Glen Hubbard's ownership of the service mark was determined in the bankruptcy court and that as a matter of collateral estoppel, Hubbard is now precluded from arguing that he did not own the service mark when it was sold in the bankruptcy.

6

1    The bankruptcy court held a hearing on February 1, 2012. Docket No. 47-3. During that
2 hearing, the court referred to the Hubbards' objection as "the objection was that the trademark is
3 probably not registered." *Id*. at 5:8-9. The court stated to the trustee that "You can sell it. If it doesn't
4 have any value, then it doesn't have any value." *Id*. at 5:10-11.

5    On March 9, 2012, the Hubbards filed a supplemental objection to the trustee's motion to sell
6 assets. Docket No. 38-10. The Hubbards reiterated their claims that Wader only granted them a license
7 to use the "Zig Zag Bail Bonds" service mark and that numerous other entities were using the mark
8 without authorization. *Id*.

9    The bankruptcy court held another hearing on April 11, 2012. Docket No. 47-4. At that hearing,
10 the Hubbards' lawyer stated that the Zig Zag Bail Bonds mark "is owned by Mr. Hubbard individually,
11 although it is subject to substantial infringement actions as that is a common name if the Court were to
12 sell it." *Id*. at 7:1-4.

13    At another hearing on June 22, 2012, the Hubbards' lawyer engaged in the following colloquy
14 with the court:

15 | THE COURT: | Anything else?

16 | MR. SUMPTER: | The next item on the list is the service mark. There's no question that Mr. Hubbard owns that.
17 | | However, in the sake of full disclosure, that mark is licensed to other entities. It has been for any number of years. This is
18 | | not something recent, and –

19 | THE COURT: | Licensed to other entities by whom?

20 | MR. SUMPTER: | Pardon?

21 | THE COURT: | Licensed to other entities by whom?

22 | MR. SUMPTER: | By the owner of the mark, Mr. Hubbard.

23 | THE COURT: | Okay.

24 | MR. SUMPTER: | And the Zig Zag tradename, trademark, has been licensed in three counties in California to other entities.
25 | | It is also a very common name which is infringed upon by any number of companies, and for the sake of full disclosure to
26 | | anybody, that should be made aware.

27 | THE COURT: | And that disclosure has been made before, and I think I may have even commented on it.
28 | | But certainly that's an asset of the estate. I would think it's –

7

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| 1 | MR. SUMPTER: | We understand – |
| 2 | THE COURT: | – not exempt. |
| 3 | MR. SUMPTER: | – that. |
| 4 | THE COURT: | It could be sold. |
| 5 | MR. SUMPTER: | We understand that, your Honor. Just understanding that it does – the asset is there subject to the licensing. |
| 6 | | |
| 7 | THE COURT: | And the licensings that Mr. Hubbard has done, does he get income from those licenses? |
| 8 | MR. HUBBARD: | From – |
| 9 | MR. SUMPTER: | Do you get any income from the Zig Zag license? |
| 10 | MR. HUBBARD: | No.[8] |
| 11 | MR. SUMPTER: | No. |
| 12 | THE COURT: | Okay. |
| 13 | MR. SUMPTER: | There's no – it's a nonincome-generating license. |
| 14 | THE COURT: | Okay. So that would be the property of the estate. That should be – |
| 15 | MR. SUMPTER: | If it was, yeah, it would. |
| 16 | THE COURT: | Yeah. It – |
| 17 | MR. SUMPTER: | But he's not getting anything from it. |
| 18 | THE COURT: | Okay. |
| 19 | | No, but I'm saying the Zig Zag name, the name, the tradename, style, all that stuff that he owns is now property of Ms. Coppa as – |
| 20 | | |
| 21 | MR. SUMPTER: | We understand. |
| 22 | THE COURT: | – trustee. |

Docket No. 42-7 at 11:3-13:1.

---

[8] The Court notes that this representation to the bankruptcy court would appear to be inconsistent with Simon's statements in her declaration that she has paid in excess of $550,000, plus a percentage of revenue, to Hubbard as consideration for the license, and that she continues to operate her bail bond businesses under the provisions of the licenses *See* Simon Decl. ¶¶ 5, 9; *see also* G. Hubbard Decl. ¶ 14 ("As of the date hereof [April 2, 2014], Lynn Simon has paid any and all consideration required under the terms of any of the licenses or sub-licenses granted to her pursuant to the Licenses.").

8

In an order filed August 7, 2012, the bankruptcy court granted the trustee's motion to sell assets. Docket No. 48-8. The order states,

**IT IS HEREBY ORDERED** that:

1. The Motion to Sell is GRANTED.
2. James A. Smith, or his nominees, as the successful bidder, shall pay to the Trustee, the total sum of $4,000.00, as payment in full satisfaction for the Registered Trademark Zig Zag Bail Bonds: Registered September 27, 2007, U.S. Patent and Trademark Office, Serial Number 78860506, Registration Number 3297585, Glen K. Hubbard, current owner.
3. That the payment shall be received by the Trustee no later than (14) fourteen days from the date of this Order.
4. Upon receipt of the payment, all right, title, and interest in the Registered Trademark Zig Zag Bail Bonds: Registered September 27, 2007, U.S. Patent and Trademark Office, Serial Number 78860506, Registration Number 3297585 shall be transferred to and vested in James A. Smith or his nominee.
5. The asset is being sold "as is where is."

**IT IS FURTHER ORDERED** that the funds shall come into the bankruptcy estate to be held by the Trustee pending further order of this court.

*Id*. The Hubbards did not file an appeal from the bankruptcy court's order granting the motion to sell assets.

The bankruptcy court entered an Order Discharging Debtor on November 8, 2012. Docket No. 145 in *In re: Glen Keith Hubbard and Reagan Anne Hubbard*, Case No. BK-N-52888-BTB. It appears from the Trustee's Final Distribution Report that the service mark was the only asset of the estate that was sold and that the proceeds were used to pay the administrative fees of the Trustee and the Internal Revenue Service, and that most creditor claims went unpaid. *See id*. at Docket No. 191.

In his declaration filed in this Court, Glen Hubbard states, "Since October 12, 2012, I have had no ownership interest, of any nature whatsoever, in the corporation known as Glen Hubbard, Inc." G. Hubbard Decl. ¶ 23. Hubbard states that "True and Correct copies of the documents approving the

9

transfer of ownership to Lynn Simon that have been approved by the California Department of Insurance are attached hereto as Exhibit 'G.' Since then I have acted as a part-time employee of Glen Hubbard, Inc." *Id.*[9] Hubbard also states, "Since the transfer of ownership of Glen Hubbard, Inc. to Lynn Simon, I have operated the businesses called Glen Hubbard Bail Bonds and 5 Star Bail Bonds and have only written bonds using the name Zig Zag Bail Bonds for bonds written for Glen Hubbard, Inc. Currently, I sub-lease an office in San Rafael from Glen Hubbard, Inc." *Id.* ¶ 24.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from

---

[9] The documents attached as Exhibit G to the Glen Hubbard declaration consist of documents filed by Simon and Hubbard with the California Department of Insurance regarding the transfer of ownership of Glen Hubbard Inc. from Hubbard to Simon; defendants have not filed any documents showing that the California Department of Insurance has approved the transfer of ownership.

10

the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

## DISCUSSION

Plaintiff seeks summary judgment on its claims for trademark infringement, unfair competition, false advertising, and trademark dilution. Plaintiff alleges that James Smith, the sole member of plaintiff Zig Zag Holdings, Inc., purchased the Zig Zag mark through the court-ordered sale in the Hubbards' bankruptcy proceedings, and that notwithstanding the sale, defendants continue to use and infringe the Zig Zag Bail Bonds mark. Defendants oppose summary judgment on numerous grounds, contending that there are factual disputes regarding, *inter alia*, the validity and ownership of the mark, the status of Lynn Simon's licenses, and whether the Zig Zag Bail Bonds mark has been diluted.

### I. Trademark infringement

The parties agree that the elements of plaintiff's federal and California common law trademark infringement claims are "substantially congruent" and thus that the analysis for both claims is the same. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.").

To prevail on its claims of trademark infringement, plaintiff must prove "(1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." *Department of Parks and Recreation for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006). After the parties briefed the motion, the Court directed the parties to supplement this record with the record from the Hubbards' bankruptcy proceedings, and ordered the parties to file supplemental briefs regarding whether the Court should grant summary adjudication on the issue of the ownership of the Zig Zag Bail Bonds mark. The parties have since supplemented the record with copies of the

11

1 bankruptcy court transcripts and filings related to the sale of the mark, as well as their supplemental
2 briefs.

3 Plaintiff contends, *inter alia*, that summary adjudication of ownership is appropriate based on
4 issue preclusion because (1) the bankruptcy court could not have ordered the sale of the Zig Zag mark
5 without determining that the mark belonged to the Hubbards' estate as an asset to sell, and (2) the
6 Hubbards raised the same objections in the bankruptcy proceedings that defendants assert in this case,
7 namely that the Hubbards did not actually own the trademark, and instead that the previous owner of
8 the Zig Zag mark, Richard Wader, only granted the Hubbards a license to use the mark.

9 Defendants argue that the bankruptcy proceedings do not have a preclusive effect in this case.
10 Defendants argue that the Hubbards never owned the mark because Wader only granted them a license
11 (and they, in turn, granted Simon a sub-license). Defendants argue that the bankruptcy court did not rule
12 on the validity of the Zig Zag Bail Bonds registration, and they emphasize the fact that the bankruptcy
13 court's August 9, 2012 order directing the sale of the mark provided that "[t]he asset is being sold 'as
14 is where is.'" Docket No. 41-1, Ex. 6 (order).

15 The Court has reviewed the record from the Hubbards' bankruptcy proceedings and concludes
16 that the question of the ownership of the "Zig Zag Bail Bonds" mark was decided in the bankruptcy
17 proceedings, and should be given collateral estoppel effect in this litigation. "Offensive non-mutual
18 collateral estoppel is a version of the doctrine [of collateral estoppel] that arises when a plaintiff seeks
19 to estop a defendant from relitigating an issue which the defendant previously litigated and lost against
20 another plaintiff." *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003) (citing
21 *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).[10] The requirements for offensive non-mutual
22 collateral estoppel are whether "(1) there was a full and fair opportunity to litigate the identical issue
23 in the prior action; (2) the issue was actually litigated in the prior action; (3) the issue was decided in
24 a final judgment; and (4) the party against whom [collateral estoppel] is asserted was a party or in privity
25 with a party in the prior action." *Syverson v. IBM*, 472 F.3d 1072, 1078 (9th Cir. 2007) (citations
26 omitted).

---

[10] As such, defendants' arguments regarding lack of mutuality are inapposite.

12

Here, there was a full and fair opportunity to litigate the ownership of the registered service mark in the Bankruptcy Court. The issue was actually was litigated before the Bankruptcy Court, with the Hubbards filing an objection, a supplemental objection, and numerous declarations, and the Bankruptcy Court holding several hearings on the matter. The Hubbards argued to the Bankruptcy Court that Glen Hubbard did not own the service mark and instead that Wader owned the mark and licensed the mark to the Hubbards. The Bankruptcy Court overruled the Hubbards' objection, and necessarily found that Glen Hubbard owned the mark in order to approve the sale of the service mark.[11] "A bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property." *Warnick v. Yassian (In re Rodeo Canon Development Corp.)*, 362 F.3d 603, 608-609 (9th Cir. 2004), *opinion withdrawn and superseded on other grounds by* 126 Fed. Appx. 353 (9th Cir. Mar. 8, 2005).

The Court finds instructive *Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*, Civil Action No. 10–6310 (MLC), 2013 WL 4804816 (D.N.J. Sept. 9, 2013). In that trademark infringement action, the plaintiff purchased a trademark in bankruptcy proceedings, and then sued the defendants for trademark infringement. Two of the defendants had participated in the bankruptcy proceedings, and had objected to the sale of the trademark on the ground that the debtor did not own the trademark. The district court held that the defendants were collaterally estopped from contesting ownership of the mark:

> The Court finds that the necessary prerequisites for application of issue preclusion have been met here: (1) the issue of ownership of the registered trade name and registered logo is the same as that involved in the bankruptcy proceeding; (2) that issue was actually and necessarily litigated before the Bankruptcy Court; (3) the Bankruptcy Court determined the issue of ownership by a final and valid judgment; and (4) that determination was essential to the approval of the proposed sale of the assets. *See Burlington N. R.R.*, 63 F.3d at 1231–32. Here, issue preclusion is being asserted against two of the four defendants: Jeffrey Siegel and Blue Ridge Farms, Inc., both of which were involved in the bankruptcy proceedings. Accordingly, the Court finds that – given the "full and fair" opportunity to litigate the same issue in the bankruptcy proceeding enjoyed by Jeffrey Siegel and Blue Ridge Farms, Inc. – they may properly be estopped from advancing the argument that the Bankruptcy Court was without power to approve and effectuate the sale of the registered trade name and registered logo from Chloe Foods to EM–ESS.
>
> The Court further finds that, as to defendants Ronald Loeb and Luis Gonzalez, though these defendants did not participate in the bankruptcy proceedings, they have raised here the same arguments as were asserted there, represented even by the same

---

[11] Further, as discussed *supra*, the Hubbards took inconsistent positions before the Bankruptcy Court, and also repeatedly represented that Glen Hubbard owned the service mark.

13

law firm. The Bankruptcy Court provided reasoning as to its jurisdiction and its adjudication of the ownership of the assets, and the Court herein adopts it.

Chloe Foods, as the debtor, was requesting approval for the sale of its assets, and the Bankruptcy Court, empowered by the bankruptcy code, was a court of competent jurisdiction to determine the metes and bounds of the debtor's estate, and then to dispose of its assets. . . .

The Defendants, in effect, still dispute that the Bankruptcy Court had the power to sell the registered trade name and registered logo because they claim Chloe Foods did not own them. The Court rejects these arguments, for it does not sit as an appellate court, re-examining the decision from a bankruptcy proceeding that took place in the Eastern District of New York in 2009. The Bankruptcy Court decided the issue adversely to Jeffrey Siegel and Blue Ridge Farms, Inc. Loeb and Gonzalez have failed to establish a genuine dispute of material fact with respect to the ownership of the registered trade name and registered logo. Therefore, the Court will grant summary judgment in favor of Fresh Prepared Foods and against the Defendants regarding the issue of ownership of the registered trade name and registered logo.

*Id.* at \*8-9 (internal citations to parties' briefs omitted).

Defendants argue that the Bankruptcy Court did not decide the question of whether Hubbard owned the service mark because the Bankruptcy Court's order states that the mark was sold "as is, where is."[12] However, in order to approve the sale of the mark, the Bankruptcy Court necessarily decided that Hubbard owned the mark. *See Warnick v. Yassian (In re Rodeo Canon Development Corp.)*, 362 F.3d at 608-09; *In re Popp*, 323 B.R. 260, 269-70 (9th Cir. BAP 2005) (holding bankruptcy court should not have authorized sale of property without first resolving disputed question of whether debtor had interest in property); *Fresh Prepared Foods, Inc.*, 2013 WL 4804816, at \*3. Accordingly, the Court GRANTS summary judgment in favor of plaintiff on the question of the ownership of the registered service mark, and holds that defendants are precluded from arguing that Glen Hubbard did not own the mark.

Defendants also argue that there are disputed issues of fact regarding the status of the Lynn Simon licenses, and therefore that the Court may not grant summary judgment on the entirety of the trademark infringement claims. The Court agrees. Plaintiff has submitted evidence showing that Hubbard terminated the licenses, and defendants have submitted evidence showing that Hubbard and Simon resolved their disputes and reinstated the licenses. No party has addressed the ability of plaintiff

---

[12] It is the Court's view that "as is, where is" likely referred to the fact that the Hubbards had repeatedly represented to the Bankruptcy Court that the service mark had no value.

14

to terminate the licenses. Thus, upon this disputed and incomplete record, the Court cannot grant summary judgment on any issue beyond the ownership of the service mark.

**II.     Remaining claims**

Plaintiff's other claims for unfair competition, false advertising and trademark dilution involve disputes of fact regarding, *inter alia*, the status of the Simon licenses because defendants contend that they are using the service mark pursuant to valid licenses.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART plaintiff's motion for summary judgment. Docket No. 38.

The parties shall be prepared to discuss with specificity at the July 22, 2014 pretrial conference what issues remain for the jury to decide, and how the parties intend to try this case.

**IT IS SO ORDERED.**

Dated: June 11, 2014

SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE